# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JAIME MENDEZ SOTO, JR. <br><br> Plaintiff, <br><br> v. <br><br> UNIVERSAL CREDIT SERVICES LLC <br>   and <br> EXPERIAN INFORMATION SOLUTIONS, INC. <br>   and <br> EQUIFAX INFORMATION SOLUTIONS LLC <br><br> Defendants. | CASE NO. <br><br> 2:21-cv-04459-MAK <br><br> **AMENDED COMPLAINT** <br><br> **JURY TRIAL DEMANDED** <br><br> **NON-ARBITRATION** |

## PRELIMINARY STATEMENT

1.  Defendants, Universal Credit Services, LLC ("UCS"), Experian Information Solutions, Inc. ("Experian"), and Equifax Information Services LLC ("Equifax"), national consumer reporting agencies ("CRAs"), have been selling credit reports inaccurately marking Plaintiff as deceased. When they inaccurately report a living consumer as deceased CRAs make it practically impossible for that consumer to access credit, as they did with Mr. Mendez Soto. Their practice also harms the businesses that purchase their reports as such companies cannot process credit applications due to the applicant's lack of a credit score. There is no good faith rationale to explain CRAs' practice other than the generation of revenue. If CRAs actually believed that Mr. Mendez Soto was deceased, they had no legally permissible basis to sell his reports. If CRAs believed Mr. Mendez Soto was alive, they knowingly sold his reports with a gross inaccuracy. Moreover, CRAs know that identity thieves use the credit information of truly

deceased persons to commit credit fraud. CRAs thus violated Plaintiff's rights under the Fair Credit Reporting Act ("FCRA"), as set forth below.

## JURISDICTION AND VENUE

2. Jurisdiction of this Court arises under 15 U.S.C. § 1692k(d) and 28 U.S.C. §1331.

3. Venue lies properly in this district pursuant to 28 U.S.C. §1391(b).

4. Venue in the Eastern District of Pennsylvania is proper as a substantial part of the events giving rise to the claim occurred in this District.

5. UCS is both a "Consumer Reporting Agency" and a "reseller" as those terms are defined by 15 U.S.C. §§ 1681a(f) and 1681a(u).

6. Upon information and belief, UCS' only physical office, and only place of business, is located in Broomall, PA.

7. UCS purchases information from the national consumer reporting agencies, including Equifax and Experian, and resells that information to mortgage companies as a consumer report colloquially called a "tri-merge."

8. The relevant transactions in this matter are attempts that Plaintiff made to refinance his mortgage in or around July and August 2021.

9. On multiple occasions, Plaintiff applied to refinance his mortgage through his current mortgage servicer, NewRez, LLC.

10. NewRez, LLC is a mortgage servicer headquartered in this District at 1100 Virginia Drive, Fort Washington, PA.

11. As part of refinance application process, NewRez, LLC contracted with UCS, which is also headquartered in this District, for the purchase of a tri-merge about Plaintiff.

12. In response to NewRez LLC's request for the tri-merge on Plaintiff, UCS sought and obtained information about Plaintiff from the national consumer reporting agencies, including Equifax and Experian.

13. Upon information and belief, the information, including the inaccurate information detailed below, that UCS obtained from Equifax and Experian is stored within this District.

14. Equifax and Experian transmitted the information on Plaintiff, including the inaccurate information detailed below, to UCS in this District, and UCS prepared the relevant tri-merge report on Plaintiff in this District.

15. UCS' tri-merge report was subsequently provided to NewRez in this District.

16. Based on that tri-merge report, which inaccurately marked Plaintiff as deceased as detailed below, NewRez, LLC denied Plaintiff's application.

17. NewRez LLC's decision to deny Plaintiff's refinance application took place in this District.

18. Plaintiff subsequently made attempts to correct the inaccurate information on the tri-merge report; however, the attempts were in vain, and NewRez LLC notified Plaintiff that because UCS continued to mark him as deceased, NewRez was unable to move forward with his refinance application.

19. Plaintiff's claims against Equifax and Experian arise from their sale of reports containing inaccurate information to UCS in this District.

20. Plaintiff's claims against UCS arise from its sale of reports containing inaccurate information to a third-party lender in this District.

21. Upon information and belief, based on the facts alleged herein, this District may be the only District where the Court would have personal jurisdiction over all the defendants, and an

appropriate venue given the fact that a substantial part of the relevant events took place in this District.

## PARTIES

22. Plaintiff Jaime Mendez Soto, Jr. is an individual who resides in Las Vegas, NV.

23. Defendant Universal Credit Services, LLC, ("UCS") is a consumer reporting agency that regularly conducts business in the Eastern District of Pennsylvania, and which has its principal place of business located at 370 Reed Road, Suite 100, Broomall, PA 19008.

24. Defendant Experian Information Solutions, Inc. ("Experian") is a consumer reporting agency that regularly conducts business in the Eastern District of Pennsylvania, and which has a principal place of business located at 475 Anton Boulevard, Costa Mesa, California 92626.

25. Defendant Equifax Information Services LLC, ("Equifax") is a consumer reporting agency that regularly conducts business in the Eastern District of Pennsylvania, and which has a principal place of business located at 1550 Peachtree Street NW, Atlanta, GA 30309.

## FACTUAL ALLEGATIONS

### *UCS, Experian and Equifax's Practices Concerning the Sale of Reports on the "Deceased"*

26. Defendants UCS, Experian and Equifax ("CRA Defendants") are regulated as "consumer reporting agencies" ("CRAs") under the FCRA 15 U.S.C. § 1681a(e).

27. CRA Defendants are regulated as "consumer reporting agencies" ("CRA") under the FCRA 15 U.S.C. § 1681a(e).

28. CRA Defendants sell millions of consumer reports (often called "credit reports" or "reports") per day, and CRA Defendants also sell credit scores. 15 U.S.C. § 1681a(e).

29. Pursuant to the FCRA, CRA Defendants must follow procedures which assure that the reports they sell meet the standard of "maximum possible accuracy." 15 U.S.C. § 1681e(b).

30. Pursuant to the FCRA, CRA Defendants must maintain reasonable procedures to assure that reports are sold only for legitimate "permissible purposes." 15 U.S.C. §§ 1681e(a) & 1681b.

31. CRA Defendants place a "deceased" notation or marking on reports when it is advised from any of its many data furnishing sources that a given consumer is deceased.

32. The furnishing sources identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with an "X" code in the ECOA field of an electronic data input format used in the credit reporting industry, known as Metro or Metro 2.

33. CRA Defendants do not request or require a death certificate from any of its data sources which advise that a consumer is "deceased" before placing a "deceased" mark on that consumer's report.

34. CRA Defendants do not request or require any proof from any data source which advises that a consumer is "deceased" showing that the consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

35. CRA Defendants do not independently verify with any source that a consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

36. A deceased notation is a very unusual marking upon a credit file or credit report.

37. CRA Defendants employ no procedures *at all* which assure that a consumer with a "deceased" mark on his/her report is, in fact, deceased before placing the "deceased" mark on that consumer's report and selling that report.

38. Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, CRA Defendants employ no procedures which assure that a consumer with a "deceased" mark on his/her report is, in fact, deceased before placing the "deceased" mark on that consumer's report.

39. Even in instances where the purportedly deceased consumer communicates directly with CRA Defendants, CRA Defendants employ no procedures which assures that a consumer with a "deceased" mark on his/her report is, in fact, deceased before placing the "deceased" mark on that consumer's report.

40. Once a "deceased" mark is placed upon a consumer's report, CRA Defendants will not calculate and will not provide a credit score for that consumer.

41. Nevertheless, CRA Defendants routinely sell to third parties credit reports for persons with a "deceased" mark on their reports with no credit score, despite a request by the purchaser of the report for a credit score for that consumer.

42. Upon CRA Defendants' reports with a "deceased" mark sold to third parties CRA Defendants never calculate or provide a credit score for that consumer.

43. CRA Defendants know that third party credit issuers use a credit score in order to process a given credit application.

44. CRA Defendants know that many third-party credit issuers require a credit score in order to process a given credit application.

45. CRA Defendants know that consumers without credit scores are unable to secure any credit from most credit issuers.

46. CRA Defendants know that living consumers are turned down for credit specifically because CRA Defendants are reporting them as "deceased" and without a credit score.

47. CRA Defendants charge third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as it would for any other report.

48. CRA Defendants profit from the sale of reports on the deceased.

49. CRA Defendants know that truly deceased consumers do not apply for credit.

50. CRA Defendants have no death certificate, executorship paper, or any other proof requirements for its data sources which report a consumer as deceased or for the buyers of its reports which access the purportedly deceased consumer's information.

51. Indeed, CRA Defendants sells reports on the deceased to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

52. For consumers who are deceased, there exists no permissible purpose under the FCRA for CRA Defendants to ever sell their credit reports, absent a court order.

53. CRA Defendants know that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

## *Case Specific Facts*

54. For a period of time since at least July 2021, Plaintiff had been marked by Defendants as "deceased" on his UCS, Experian and Equifax credit reports.

55. Plaintiff is not deceased.

56. UCS, Experian and Equifax did not calculate or provide any credit score for or on Plaintiff, even though they sold reports about him to third parties marking him as "deceased."

57. Plaintiff has disputed the inaccurate information with Experian from September 2021 through the present.

58. Notwithstanding Plaintiff's efforts, Experian has sent Plaintiff correspondence indicating its intent to continue publishing the inaccurate information and Defendant continues to publish and disseminate such inaccurate information to other third parties, persons, entities and credit grantors. Defendant has repeatedly published and disseminated consumer reports to such third parties from at least July 2021 through the present.

59. Despite Plaintiff's efforts, Experian has never: (1) contacted Plaintiff to follow up on, verify and/or elicit more specific information about Plaintiff's disputes; (2) contacted all third parties that would have relevant information concerning Plaintiff's disputes; (3) forwarded any relevant information concerning Plaintiff's disputes to the entities originally furnishing the inaccurate information; and (4) requested or obtained any credit applications, or other relevant documents from the entities furnishing the inaccurate information.

60. As a result, Defendants made it practically impossible for Plaintiff to obtain credit.

61. As a result of Defendants' conduct, Plaintiff has suffered actual damages in the form of credit denial or loss of credit opportunity, credit defamation and emotional distress, including anxiety, frustration, embarrassment and, humiliation.

62. At all times pertinent hereto, Defendants were acting by and through their agents, servants and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

63. At all times pertinent hereto, the conduct of Defendants, as well as that of their agents, servants and/or employees, was intentional, willful, reckless, and in grossly negligent disregard for federal law and the rights of the Plaintiff herein.

## COUNT I –VIOLATIONS OF THE FCRA
### (Plaintiff v. UCS and Equifax)

64. Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

65. UCS and Equifax were "person[s]" and "consumer reporting agenc[ies]" as those terms are defined by 15 U.S.C. § 1681a(b) and (f).

66. At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

67. At all times pertinent hereto, the above-mentioned credit reports were "consumer reports" as that term is defined by 15 U.S.C. § 1681a(d).

68. Pursuant to 15 U.S.C. §1681n and 15 U.S.C. §1681o, UCS and Equifax are liable to the Plaintiff for willfully and negligently failing to comply with the requirements imposed on a consumer reporting agency of information pursuant to 15 U.S.C. §§ 1681e(b).

69. The conduct of UCS and Equifax are a direct and proximate cause, as well as a substantial factor, in bringing about the serious injuries, actual damages and harm to Plaintiff that are outlined more fully above and, as a result, UCS and Equifax are liable to Plaintiff for the full amount of statutory, actual and punitive damages, along with the attorney's fees and the costs of litigation, as well as such further relief, as may be permitted by law.

## COUNT II –VIOLATIONS OF THE FCRA
### (Plaintiff v. Experian)

70. Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

71. Experian was a "person" and "consumer reporting agency" as those terms are defined by 15 U.S.C. § 1681a(b) and (f).

72. At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

73. At all times pertinent hereto, the above-mentioned credit reports were "consumer reports" as that term is defined by 15 U.S.C. § 1681a(d).

74. Pursuant to 15 U.S.C. §1681n and 15 U.S.C. §1681o, Experian is liable to the Plaintiff for willfully and negligently failing to comply with the requirements imposed on a consumer reporting agency of information pursuant to 15 U.S.C. §§ 1681e(b) and 1681i.

75. The conduct of Experian was a direct and proximate cause, as well as a substantial factor, in bringing about the serious injuries, actual damages and harm to Plaintiff that are outlined more fully above and, as a result, Experian is liable to Plaintiff for the full amount of statutory, actual and punitive damages, along with the attorney's fees and the costs of litigation, as well as such further relief, as may be permitted by law.

## JURY TRIAL DEMAND

76. Plaintiff demands trial by jury on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff seeks judgment in Plaintiff's favor and damages against the Defendants, based on the following requested relief:

    (a)    Actual damages;

    (b)    Statutory damages;

    (c)    Punitive damages;

    (d)    Costs and reasonable attorney's fees; and

    (e)    Such other and further relief as may be necessary, just and proper.

Respectfully Submitted,

**FRANCIS MAILMAN SOUMILAS, P.C.**

BY:   */s/ Joseph L. Gentilcore*
Joseph L. Gentilcore, Esq.
Francis Mailman Soumilas, PC
1600 Market Street, Suite 2510
Philadelphia, PA 19103
jgentilcore@consumerlawfirm.com
215.735.8600

Dated:  October 20, 2021              *Attorneys for Plaintiff*